**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Nancy J. Brown,

       Plaintiff,                               Case No.  1:13cv869

          v.                                   Judge Michael R. Barrett

Duke Energy Corporation,

       Defendant.

## OPINION & ORDER

This matter is before the Court upon Defendant Duke Energy's Motion for Summary Judgment. (Doc. 40). Plaintiff Nancy Brown filed a Response (Doc. 57) and Defendant filed a Reply (Doc. 63). The parties provided additional briefing on Plaintiff's request for adverse inferences as a discovery sanction. (Docs. 66, 68, 70).

## I.  BACKGROUND

The facts of this case are largely undisputed. Plaintiff is a Caucasian female born in 1962. (Doc. 1, ¶ 10). Plaintiff has been partially deaf since childhood. Plaintiff also has severe allergies, including an allergy to mold. Plaintiff began her employment with Defendant in May of 2007. In September of 2010, she was hired into the position of Billing Supervisor. In that position, she reported to Paige Adams. Adams, in turn, reported to Billing Director Greg Cranford, who was located in Charlotte, North Carolina.

During the summer of 2011, a conflict arose between Plaintiff and Adams over Plaintiff's efforts to discipline three employees supervised by Plaintiff: Terrell Williams, Darnell McGee, and Chris Elliot. (Doc. 37, Nancy Brown Dep. at 42, PAGEID# 3329). Williams and McGee are African American; Eliot is Caucasian. Plaintiff believed that

Adams was trying to protect them. (Id. at 96, PAGEID# 3383). Plaintiff raised her concerns with Adams. (Id. at 43, PAGEID# 3330). Plaintiff also raised her concerns with Cranford. (Id.) Plaintiff met with Melissa Feldmeier, who was an in-house attorney for Defendant. (Id.) Plaintiff explained to Feldmeier that she believed Adams was preventing her from reprimanding these employees because they were male and African American. (Doc. 29, Melissa Feldmeier Depo. at 13, PAGEID# 1959). Feldmeier referred the matter to investigation. (Id. at 17, PAGEID# 1963). As a result of the investigation, Adams was transferred to another position. (Id. at 28-29, PageID 1974-75). After Adams was transferred, Tiffany Moore[1] assumed Adams' role of Mass Market Manager. (Doc. 20, Greg Cranford Dep. at 44, PAGEID# 318).

In January of 2012, Plaintiff began having sinus infections due to mold in her office building. (Brown Dep. at 24, PAGEID# 3311). Plaintiff asked Moore for an air filter for her office, but did not receive one. (Id.)

Plaintiff had been using Moore's administrative assistant, Michelle Basch, to help her proofread her written communications. (Doc. 36, Moore Dep. at 46, PAGEID# 2855). However, at some point, Moore told Basch that she needed to prioritize her own deadlines over the proofreading work she was doing for Plaintiff. (Moore Dep, at 48, PAGEID# 2857).

Plaintiff began taking notes about her interactions with Moore. (Doc. 38-1, PAGEID# 3969). Plaintiff wrote that during a meeting on June 6, 2012, Moore told Plaintiff that because she had "been missing work to go to doctors and [because she was] sick,"

_____

[1]Moore was subsequently married and her last name changed to Dennison. (Doc. 22, Tiffany Moore Dennison Dep. at 272, PAGEID# 683).

Moore "did not know if she was going to discipline me or put me on FMLA."  Doc. 38-1, PAGEID# 3970).

Moore became concerned that Plaintiff had some work performance issues.  (Doc. 36, Tiffany Moore Dennison Dep. at 57, PAGEID# 2866).  Specifically, Plaintiff had a lot of time out of the office, had communication problems, and had trouble "seeing the big picture."[2]  (Id. at 60-61, PAGEID# 2869-2870).  Moore contacted Bernadette Toebbe in the Human Resources Department about these issues.  (Id.)  Moore worked with Toebbe on developing a Performance Improvement Plan ("PIP").  (Id. at 68, PAGEID# 2877).  Moore and Toebbe had decided to give Plaintiff the PIP at the same time as her mid-year performance appraisal.  (Id. at 149, PAGEID# 2958).

The PIP focused on three areas for improvement: availability, communication skills, and focusing on what matters most.  (Doc. 57-4 at PAGEID# 8014).  The PIP also outlined what Plaintiff needed to do to improve in each of those areas.  (Id.)  Under "availability," the PIP states that "[i]f doctor's appointments and other personal appointments cannot be made outside of regularly scheduled work hours, then schedule these appointments as close as possible to the beginning of your regularly scheduled work day or as close as possible to the end of your regularly scheduled work day, or during your lunch hours.  This includes travel time to and from appointment."  (Doc. 57-4, PAGEID# 8014).  The PIP also notes that "[t]here has been and excessive amount of non-FMLA absenteeism, late arrivals and/or early departures from January through June,

_____

[2]As an example of "having trouble seeing the big picture," Moore testified: "One example that sticks out with me that we spent a lot of time discussing was around her husband's Safety Day at the zoo, and not understanding why she had to take vacation time for that when her husband [who also was employed by Defendant] did not."  (Doc. 36, Moore Dep. at 61, PAGEID# 2870).

2013." (Id.) The PIP then lists seventeen occasions when Plaintiff was out for sickness, doctors' appointments, a CT scan or gum surgery. (Doc. 57-4, PAGEID# 8014-8015).

In the mid-year performance appraisal, one of Plaintiff's competencies was "Communicating with Impact." (Doc. 37-1, PAGEID# 3741). Under "Areas for Improvement" it states:

> This continues to be a struggle. Nancy has made improvement on her weekly updates, and is doing a better job of keeping me in the loop on items, but still has a hard time with what items need to be brought to my attention (this goes back in part to seeing how her team fits into the big picture). Her spelling errors also have improved over the last few months, however, the amount of misspelled words and grammatical errors is still unacceptable. A recent example of this was in an email to HR in regards to an employee knocking on Nancy's door; Nancy wrote "interpret" when it should be "interrupt" several times throughout the correspondence-Nancy recognizes her challenges in written communication and is working to improve via classes. Now, she should focus on taking what she learns during her classes and apply them to her day to day activities. Nancy needs to proofread her work more closely prior to sending emails, documents, etc. When In question of a meaning of a specific word Nancy either needs to look the word up or ask others for guidance.

(Doc. 37-1, PAGEID# 3741).

A meeting to discuss Plaintiff's mid-year performance appraisal and the PIP was scheduled for July 19, 2012. (Doc. 22, Moore Dep. at 367, PAGEID# 2262). However, on the morning of July 19th, Plaintiff cancelled the meeting because she was going to the doctor. (Doc. 23, Brown Dep. at 272, PAGEID# 3559; Doc. 37-1 at PAGEID# 3734). Plaintiff went out on FMLA leave that same day, and returned on September 24, 2012. (Id.)

On September 25th, Moore delivered Plaintiff's mid-year performance appraisal and placed her on the PIP. (Doc. 36, Moore Dep at 147, PAGEID# 2956; Doc. 37-1, PAGEID# 3738). Plaintiff requested a review of her mid-year performance appraisal and

the PIP. (Doc. 29-1, Feldmeier Dep. Ex. 58, PAGEID# 2052-2083). Plaintiff claimed that the performance issues were never brought to her attention before the mid-year performance appraisal and the PIP. (Doc. 37-1, PAGEID# 3771). Defendant's HR Business Partner, Georgia Curley, conducted the investigation on behalf of James Rainer, Vice-President of Revenue Services. (Doc. 29-1, Felmeier Dep. Ex. 59, PAGEID# 2084). The decision to administer the PIP and the 2012 mid-year performance appraisal was upheld. (Id.)

On September 28, 2012, Plaintiff reported to Cranford that she felt "harassed again." (Doc. 36-1, PAGEID# 3201-3202).

In October of 2012, Duke Energy began a reorganization of the company as the result of its merger with Progress Energy. (Cranford Dep. at 63, PAGEID# 337). Defendant reduced the number of Billing Supervisors in Charlotte, North Carolina from three to two. (Doc. 36, Moore Dep. at 168, PAGEID# 2977). Defendant did not conduct interviews for the Billing Supervisor positions in Charlotte. (Doc. 36, Moore Dep. at 169, PAGEID# 2978). However, Cranford decided to open up Plaintiff's Billing Supervisor position for interviews. (Cranford Dep. at 66-67, PAGEID# 340-41). Plaintiff was notified on October 1, 2012 that she could interview for her own position as Billing Supervisor. (Doc. 38-1, PAGEID# 3908).

Plaintiff was one of six candidates who interviewed for the Cincinnati Billing Supervisor position. (Cranford Dep. at 170). Plaintiff's interview took place on October 3, 2012. (Doc. 36-1, PAGEID# 3138). Cranford conducted the interviews along with Georgia Curley and Kevin King, who was replacing Moore as manager for Mass Market Billing. (Cranford Dep. at 80, 169, PAGEID# 354, 443). King testified that before he took

over Moore's position as Mass Market Billing Manager, Moore discussed Plaintiff with King. (Doc. 46, Kevin King Dep. at 31, PAGEID# 5305). Moore told King that Plaintiff was on a PIP, but King does not know if that was before Plaintiff's interview. (King Dep. at 78, PAGEID# 5352).

The interviewers used a worksheet to score each candidate based on certain qualifications, such as customer service experience, and written and oral communication skills. (Cranford Dep. at 169-170, 173-174, PAGEID# 443-444, 447-448; Doc. 35-1, PAGEID# 2748). Some qualifications were given more weight than others when calculating the scores of the candidates. (Cranford Dep. at 177, PAGEID# 451). The interviewers discussed and agreed upon the final scores for each of the candidates. (Cranford Dep. at 169, PAGEID# 443). The candidates were ranked based on their scores. (Cranford Dep. at 171, PAGEID# 445). Plaintiff was ranked fifth out of the six candidates. (Doc. 35-1, PAGEID# 2748). Based on this process, King recommended Ryan Champness for the position. (Cranford Dep. at 169, PAGEID 443). Both Crawford and Curley agreed with King's decision. (Id.)

Plaintiff was informed at the end of October that she had not been hired into the Billing Supervisor position, and she had until November 30, 2012 to find another position within the company. (Doc. 37, Brown Dep. at 297, PAGEID# 3584). Plaintiff applied for several positions within the company. Plaintiff also applied for intermittent FMLA leave to allow her to get allergy shots during the day. (Doc. 37, Brown Dep. at 294, PAGEID# 3581; Doc. 31-1, 3748-3750). While Plaintiff submitted the initial documentation to request leave, she did not respond to a request for additional medical information. (Doc. 37-1, PAGEID# 3751-3754). Therefore, Plaintiff's request was denied. (Id.)

Plaintiff was unable to find another position within the company, and her employment was terminated. (Doc. 38-1, PAGEID# 3921, 3930).

Plaintiff brings the following claims: (1) interference and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*; (2) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); (3) age discrimination in violation of Ohio Civil Rights Act, Ohio Revised Code § 4112.02 *et seq.*; (4) gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*; (5) discrimination, retaliation and failure to accommodate in violation of the Americans with Disability Act, 42 U.S.C. § 12101, *et seq.*; and (6) disability discrimination in violation of Ohio Revised Code § 4112.02, *et seq.* and §4112.99.

Defendant moves for summary judgment on all of Plaintiff's claims. Plaintiff concedes that Defendant is entitled to summary judgement on her claim for age discrimination under the ADEA and Ohio law. (Doc. 57, PAGEID# 7825).

## II.   ANALYSIS

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## B. **Adverse inferences as sanction**

Plaintiff argues that Defendant intentionally withheld or destroyed relevant documents and therefore she is entitled to adverse inferences at the summary judgment stage as a sanction. Defendant responds that Plaintiff failed to satisfy the procedural requirements to request an inference as a sanction. Defendant explains that Plaintiff did not file her request for sanctions as a motion, and raised the spoliation claim for the first time in her opposition to Defendants' summary judgment motion.

Courts generally consider spoliation motions that come as part of an opposition to summary judgment as being untimely. *Crown Battery Mfg. Co. v. Club Car, Inc.*, 185 F. Supp. 3d 987, 996 (N.D. Ohio 2016). However, the Court notes that the subject of missing documents was discussed in several discovery conferences with the Court. (See Minute Entries 10/28/15, 11/24/15, 3/25/16, 4/20/16, 4/25/16, 11/17/16, 12/02/16, 1/10/17, 2/27/17, 3/3/17, 4/14/17, 5/4/17, 5/17/17, 6/16/17, 8/18/17, 9/28/17). Therefore, the Court will permit Plaintiff to raise the issue in the current procedural posture.

Plaintiff maintains that the following documents are missing: (1) instant messages ("IMs") exchanged between employees in Defendant's human resources ("HR") department; (2) charts showing Defendant's historical organizational structure; (3) the entire contents of Georgia Curley's file on Plaintiff; (4) missing annual performance reviews for Sherri Pagan,[3] who was not selected for Billing Supervisor position in Defendant's Charlotte office; and (4) missing employment documents for employees who were also interviewed and rejected for the Billing Supervisor position.

---

[3]At different points in the record, Pagan is referred to as Sharonne Pagan.

"[A] a party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). In addition, Federal Rule of Civil Procedure 37(e), which was amended to its current version in 2015 after the Sixth Circuit's decision in *Beaven*, likewise provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). As one district court has explained, an adverse inference at the summary judgment stage is to be applied as follows:

> "[D]estruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive summary judgment on that claim." *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998). However, in "borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the

plaintiff to survive summary judgment." *Byrnie*, 243 F.3d at 107; *accord Schreane*, 575 Fed.Appx. at 490; *Talavera v. Shah*, 638 F.3d 303, 312 (D.C.Cir. 2011) ("The spoliation inference must be considered along with [the plaintiff's] other admissible evidence regarding unlawful gender discrimination.")

*Benefield v. Mstreet Entm't, LLC*, 197 F. Supp. 3d 990, 1000 (M.D. Tenn. 2016).

Citing the testimony of Gretchen Johnson, the former Director of Call Center Operations for Defendant, Plaintiff states that HR personnel communicated via IMs. Plaintiff claims Defendant did not search for IMs, and the only ones produced in discovery were those which were forwarded as emails. However, as Defendant points out, Johnson actually testified it was not her experience that Defendant's HR employees would communicate with managers over IM. (Doc. 47, Gretchen Johnson Dep. at 104, PAGEID# 5681).

The Court recognizes this discrepancy in Johnson's testimony, but also recognizes that Johnson's experience may have been limited. Defendant has not explained why the IMs—other than those which were forwarded as emails—were not produced. In a similar scenario, another district court found that for purposes of summary judgment, the court could infer that text messages were a frequent medium for communication between managers, and the missing text messages may have contained communications between the managers adverse to the employer. *Benefield v. Mstreet Entm't, LLC*, 197 F. Supp. 3d at 1006.

However, Plaintiff has not explained why the IMs are relevant. As the Sixth Circuit has explained:

> In this context, "relevant" means: "something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or

unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *One Beacon Ins. Co. v. Broad. Dev. Group, Inc.*, 147 Fed.Appx. 535, 541 (6th Cir. 2005) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108–09 (2d Cir. 2002)) (brackets in original, internal quotation marks omitted). "A party seeking an adverse inference may rely on circumstantial evidence to suggest the contents of destroyed evidence." *Beaven*, 622 F.3d at 555 (citation and brackets omitted).

*Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 514 (6th Cir. 2014).

Here, Plaintiff has not adduced sufficient evidence to infer that the destroyed IMs would have been of the nature alleged by Plaintiff. The IMs which were produced were a conversation between Plaintiff and Kathy Walker;[4] and a conversation between Plaintiff and Moore. (Doc. 66-1, PAGEID# 8485, 8486). There is nothing about these IMs which would provide circumstantial evidence to suggest the contents of the missing IMs. Therefore, the IMs cannot serve as a basis for an adverse inference.

Next, Plaintiff explains that in discovery Defendant claimed that it did not have historical organizational charts, but it was later discovered that Defendant can produce these charts. However, as Defendant explains, while it is possible for it to create such charts, it does not normally maintain these charts. (Doc. 45, Marie Broome Dep. at 147, PAGEID# 1301). Therefore, the Court finds that Defendant did not destroy the historical organizational charts because they did not exist when Plaintiff requested them.

Defendant admits that it produced additional documents maintained by Georgia Curley following her second deposition. Defendant explains that Curley was repeatedly asked to produce her complete file, and it does not know why these documents were not previously provided. Defendant points out that Curley's documents were produced before the close of discovery and before its motion for summary judgment was filed; and

_____

[4]It is not clear from the record who Kathy Walker is.

therefore Plaintiff could have mitigated any harm caused by the late production of these additional documents by re-deposing Curley. The Court notes that other witnesses were re-deposed (See Doc. 27) and finds the missing documents from Curley's file cannot serve as a basis for an adverse inference.

Plaintiff claims the yearly performance reviews for Sherri Pagan are missing. Plaintiff also explained that she was not provided with certain personnel documents for the other employees who interviewed but were not hired for the Billing Supervisor position in Cincinnati. Plaintiff argues that the failure to comply with 29 C.F.R. § 1602.14 in and of itself entitles Plaintiff to a rebuttable presumption that the missing documents would have bolstered her case. *Accord Lombard v. MCI Telecommunications Corp.*, 13 F. Supp. 2d 621, 628 (N.D. Ohio 1998) (explaining that if the plaintiff can prove the defendant failed to follow the document preservation rules set out in 29 C.F.R. § 1602.14, then the plaintiff is entitled to the benefit of a rebuttable presumption that the missing documents would have bolstered her case).

An employer is required to retain certain employment records under 29 C.F.R. § 1602.14:

> Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination. Where a charge of discrimination has been filed, or an action brought by the Commission or the Attorney General, against an employer under title VII, the ADA, or GINA, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action.

29 C.F.R. § 1602.14.  Under this regulation, the term "personnel records relevant to the charge," includes by example: "personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and *by all other candidates for the same position as that for which the aggrieved person applied and was rejected*."  29 C.F.R. § 1602.14 (emphasis added).

Defendant argues that Plaintiff has not shown how these documents are relevant to her case because these employees, like Plaintiff, were not hired into the Billing Supervisor position.  Defendant also argues that Plaintiff has not shown that these documents were destroyed with a culpable state of mind.

To show a culpable state of mind under Federal Rule of Civil Procedure 37(e)(2), Plaintiff must show that Defendant "acted with the intent to deprive another party of the information's use in the litigation."  *Accord Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) (noting that "[a] showing of negligence or even gross negligence will not do the trick" for a party seeking an adverse inference instruction for the destruction of electronic information).  Under the Sixth Circuit's three prong test set forth in *Beaven,* "the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or negligently.'"  *Beaven*, 622 F.3d at 554 (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002)).  However, as one district court has noted, there is some out-of-circuit precedent that indicates a different standard for the culpable state of mind issue when spoliation is raised in a response to a motion for summary judgment.  *Ouza v. City of Dearborn Heights*, No. 16-14331, 2019 WL 339616, at *3, n.1 (E.D. Mich. Jan. 28, 2019)

(collecting cases). These courts have held where spoliation is raised in this manner, there must be "actual evidence that the alleged spoliation was intentional and driven by a desire to suppress the truth." *Id.* (citing *Davis v. Quaker Valley School District*, 693 Fed. Appx. 131, 135 (3d Cir. 2017)). The Court finds that Plaintiff has not carried her burden under any of these standards.

To establish that Defendant withheld or destroyed evidence and did so in bad faith, Plaintiff cites to the testimony of Marie Broome, Defendant's Director of Human Resources Systems. Plaintiff cites Broome's testimony that she was not aware of a litigation hold for this case. (Doc. 25, Marie Broome Dep. at 54, PAGEID# 1208). However, Defendant points out that Broome's only involvement in Plaintiff's case was that she was identified as the corporate representative for purposes of the Rule 30(b)(6) deposition, and there is no evidence that Broome should have received a litigation hold. The Court notes that Broome testified that she was aware of the collection of the data for this lawsuit, but she was "not directly involved with extracting the data." (Id. at 13, PAGEID# 1167). Moreover, Broome testified that: "Most of the times I'm involved with legal hold (sic) are related to mergers and acquisitions and how long we hold data, particularly if there were any suits pending as a result of a merger or acquisition." (Id. at 54, PAGEID# 1208). The Court finds that even if the documents were shown to be relevant, Plaintiff has not established that the yearly performance reviews for Sherri Pagan and personnel documents for the other employees who interviewed but were not hired for the Billing Supervisor position were destroyed with a culpable state of mind. *Cf. Lombard v. MCI Telecommunications Corp.*, 13 F. Supp. 2d at 627 (after plaintiff filed her EEOC retaliation charge, the employer purged plaintiff's personnel file of all positive

comments in favor of negative documentation and also destroyed documentation of an investigation which was critical to the plaintiff's claim). Therefore, the Court concludes that Plaintiff is not entitled to an adverse inference instruction based on the destruction of evidence.

### C. FMLA

Plaintiff brings claims of interference and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* Plaintiff claims that Defendant interfered with her right to take FMLA leave by failing to notify her of her right to intermittent FMLA leave and retaliated against her by disciplining her and ultimately terminating her for FMLA-qualifying absences.

Under the FMLA, an eligible employee is entitled to twelve weeks of leave each year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of [the employee's] position." 29 U.S.C. § 2612(a)(1)(D). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA provision. 29 U.S.C. § 2615(a)(1). The FMLA also prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: "(1) the so-called "interference" or "entitlement" theory arising from § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising from § 2615(a)(2)." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). The Sixth Circuit has explained:

> Although we have held that a claim for retaliatory discharge is cognizable
> under either theory, the requisite proofs differ. The interference theory has

15

its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. *Arban*, 345 F.3d at 401. The central issue raised by the retaliation theory, on the other hand, is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation and internal quotation marks omitted). In contrast to the interference theory, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id.*

*Id.* at 282 (footnote omitted). The burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to both interference and retaliation claims which are based on circumstantial evidence. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).

## 1. Interference under FMLA

A plaintiff establishes a *prima facie* case of interference under the FMLA by showing that: (1) she was an FMLA-eligible employee, (2) the defendant was an "employer" as defined under the FMLA, (3) she was entitled to FMLA leave, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled. *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (citing *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). Because the FMLA is not a strict-liability statute, the employee also must show that the employer's violation caused him or her harm. *Edgar*, 443 F.3d at 507-508.

Plaintiff requested and was granted FMLA leave for a period between July 2012 and September 2012. In October of 2012, Plaintiff requested intermittent FMLA leave, but her request was denied because Plaintiff did not provide the information necessary for the medical certification. (Doc. 37-1, PAGEID# 3751). However, Plaintiff's FMLA

interference claim does not appear to be based on the denial of this request. Instead, Plaintiff's claim appears to be based on the sick days, doctor appointments, CT scan and gum surgery which were listed in her PIP.

Defendant argues that Plaintiff has not shown that she was entitled to FMLA leave for this time because she did not show that she had a serious health condition which rendered her incapacitated. Plaintiff argues that Defendant is mistaken that the employee must be incapacitated from work, especially where the serious health condition is chronic. Plaintiff claims the following chronic conditions: severe mold allergies which caused chronic rhinosinusitis; and a back condition. Plaintiff explains that her rhinosinusitis lead to at least three absences, a CT scan and two doctor's appointments. However, Plaintiff concedes that her back condition did not cause her to miss work in 2012.

As this Court has explained:

A serious health condition involving continuing treatment by a health care provider includes any "period of incapacity or treatment for such incapacity due to a chronic serious health condition." 29 C.F.R. § 825.115(c). The term "incapacity" means "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b). A "chronic serious health condition is one which: (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider ..., (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." 29 C.F.R. § 825.115(c). Incapacitation for the purposes of the FMLA "does not mean that, in the employee's own judgment, he or she should not work, or even that it was uncomfortable or inconvenient for the employee to have to work. Rather, it means that a 'health care provider' has determined that, in his or her professional medical judgment, the employee cannot work (or could not have worked) because of the illness." *Alston v. Sofa Express, Inc.*, Case No. 2:06–cv–0491, 2007 WL 3071662, *8 (S.D.Ohio Oct. 19, 2007) (Graham, J.) (quoting *Olsen v. Ohio Edison Co.*, 979 F.Supp. 1159, 1166 (N.D.Ohio 1997)).

*Linebarger v. Honda of Am. Mfg., Inc.*, 870 F. Supp. 2d 513, 523–24 (S.D. Ohio

2012).  Plaintiff has not pointed to any evidence that a healthcare provider determined that she was incapacitated during the period of times she claims she was entitled to leave. Moreover, Plaintiff has not shown that Defendant was on notice that she required leave the sick days, doctor appointments, CT scan and gum surgery which were listed in her PIP.  *See Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2006) (While an employee is not required to specifically reference or even mention the FMLA, "the employee must give the employer enough information for the employer to reasonably conclude," that a qualifying event has occurred.).  Therefore, Plaintiff has not established a *prima facie* case of interference under the FMLA and Defendant is entitled to summary judgment on this claim.

## 2.  Retaliation under FMLA

A plaintiff establishes a prima facie case of retaliation under the FMLA by showing that: "(1) she availed herself of a protected right under the FMLA by notifying [the defendant] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action."  *Edgar*, 443 F.3d at 508; *see also Sharp v. Profitt*, 674 Fed.Appx. 440, 451 (6th Cir. 2016) ("[I]t seems that FMLA retaliation requires a showing of but-for causation.").  The Court notes that "[a] plaintiff's burden in establishing a prima facie case is not intended to be an onerous one."  *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

Plaintiff claims that she was placed on a PIP because she took FMLA leave.  This Court has held that a low performance evaluation, on its own, is not an adverse employment action.  *Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 727 (S.D.

Ohio 2011), *aff'd*, 504 F. App'x 473 (6th Cir. 2012). However, the Sixth Circuit has found that where a counseling and performance improvement plan lead to termination, such criticism in performance reviews and performance improvement plans could be considered adverse employment actions. *Bacon v. Honda of Am. Mfg., Inc.*, 192 F. App'x 337, 344 (6th Cir. 2006); *see also Dendinger v. Ohio*, 207 Fed.Appx. 521, 527 n.6 6th Cir. 2006) (explaining that "the "adverse action" standard is more expansive in retaliation cases than in discrimination cases). Here, Plaintiff was required to apply and interview for her own job. Defendant's failure to hire Plaintiff into that position constituted an adverse employment action.[5]

Defendant argues that even if the PIP is considered an adverse employment action, Plaintiff has not shown a causal connection between her period of leave between July 2012 and September 2012 and the PIP. Defendant explains that the decision to place Plaintiff on a PIP preceded her request to take FMLA leave. The Court agrees that the decision to place Plaintiff on a PIP cannot establish causation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (finding that employers "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). However, being placed on the PIP is not the only adverse employment action Plaintiff suffered. Defendant also failed to hire Plaintiff for her own position of Billing Supervisor a little over a month after she returned from her FMLA leave. "Where an adverse employment action occurs very close in time

---

[5]The Court notes that "[i]n general, a lateral transfer, or the refusal to make a lateral transfer, is not a materially adverse action." *Freeman v. Potter*, 200 F. App'x 439, 443 (6th Cir. 2006). However, this case involves a failure to hire because Plaintiff was interviewing to keep her job, not to be hired into a "better" job. The Court notes that Plaintiff does not argue that the failure to hire her for the positions she applied for after she was not hired into the Billing Supervisor position were an adverse employment action for purposes of her FMLA claim.

after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Here, Plaintiff was on FMLA leave between July 2012 and September 2012. Plaintiff returned on September 24, 2012, interviewed for her Billing Supervisor position on October 3, 2012, and was told at the end of October that she had not been selected for the position. The Court finds that this proximity in time between the protected activity and the adverse employment action constitutes evidence of a causal connection. *Accord Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (finding causal connection where the plaintiff was terminated three months after she requested FMLA leave, and the very day that she was scheduled to return to work).

Therefore, the Court concludes that Plaintiff has established a prima facie case of retaliation under the FMLA.

If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for [plaintiff's] discharge." *Skrjanc*, 272 F.3d at 315; *see also Hemmert v. Quaker Oats Co.*, 157 F. Supp. 2d 864, 879 (S.D. Ohio 2000) (noting that a "failure to re-hire" claim "is properly analyzed under the burden-shifting *McDonnell Douglas* approach"). If the employer "articulates such a reason, then [the plaintiff] has the burden of showing that the articulated reason is in reality a pretext to mask discrimination." *Skrjanc*, 272 F.3d at 315. A plaintiff establishes pretext "by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).

Defendant explains that it opened up Plaintiff's Billing Supervisor position for interviews based on Plaintiff's poor performance in the role. Defendant explains that Plaintiff was not hired into that position based on her low ranking in the interview process.

Plaintiff argues that these reasons are pretext for discrimination, and the failure to hire her was a direct result of her PIP and other negative performance information that her managers and HR shared during the interview process. Plaintiff maintains this information was false, and the PIP was intended to set her up for termination.

The Court notes that the PIP placed an emphasis on attendance. The PIP stated, "Employee must be at work and ready to work during scheduled hours. Must also be willing to adjust schedule to accommodate any meetings, work load, and issues that may arise." (Doc. 57-4, PAGEID# 8014). The PIP was careful to exclude leave protected by the FMLA from Plaintiff's attendance issues. Under availability, the PIP cited Plaintiff's excessive "non-FMLA absenteeism" for illness or personal doctor appointments. (Id.) When working on a draft of the PIP, Toebbe told Moore in an email: "I want to think about how we are approaching 'sick time'. We need to approach it but want to be sure it's the right way as that can be such a sticky situation." (Doc. 32-2, PAGEID# 2420). Before the PIP was in place, Plaintiff's notes show that Moore told Plaintiff that because Plaintiff had "been missing work to go to doctors and [because she was] sick," Moore "did not know if she was going to discipline me or put me on FMLA." (Doc. 38-1, PAGEID# 3970).

This focus on Plaintiff's attendance did not exist before the PIP. In March of 2012, Plaintiff received her annual performance review for 2011. (Doc. 37-1, PAGEID# 3702). Plaintiff was rated "fully meets" in six of the eight areas identified. (Doc. 37-1, PAGEID #3710). In the remaining two areas, she was rated "partially meets." (Id.) These two

areas were "Communicating with Influence" and "Operational Duties." (Id.) There is no discussion of Plaintiff's attendance in the 2011 annual performance review.

Plaintiff questions her ranking and the process used during the interview process. This Court is not permitted to question Defendant's hiring criteria. *See Browning v. Dep't of Army*, 436 F.3d 692, 698 (6th Cir. 2006) (citing *Lomax v. Sears, Roebuck, & Co.*, 2000 WL 1888715, at *4 (6th Cir. Dec. 19, 2000) (holding that the plaintiff's assessment of his own qualifications was irrelevant to the discrimination inquiry). Employers are "afforded great flexibility" when selecting management personnel, and the Sixth Circuit has explicitly held that "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons." *Id.* (quoting *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) (holding that the employee's subjective belief as to why she was terminated fails to satisfy the summary judgment standard)).

However, the Court notes that there is some internal discrepancy between the interview process Defendant used for the Billing Supervisors in Charlotte and Plaintiff's position in Cincinnati. Defendant reduced the number of Billing Supervisors in Charlotte from three to two, but did not any conduct interviews. (Doc. 36, Moore Dep. at 169, PAGEID# 2978). The Billing Supervisor who was not selected, Sherri Pagan, was placed in another billing position without an interview. (Doc. 22, Moore Dep. at 394, PAGEID# 805; Doc. 20, Cranford Dep. at 436, PAGEID# 436).

Moreover, there was some concern about the timing of the PIP and the reorganization. In an email dated May 24, 2012, Lisa Shefte, from the HR Department, stated:

As far as Nancy, we think she needs to be put on a PIP, it seems that she has availability issues but since she is exempt, she should be paid sick time for the time she is having surgery etc. I think times that she chooses to go home after a noon doctor apt., etc, clearly need to be addressed . . . we need to put her on a PIP to address these issues and if she is not capable of getting to this level, there should be opportunities which become available after the UWUA VSP window opens which may be a better fit for her skill set.

(Doc. 32-2, PAGEID# 2377). The email was sent to Cranford, Tobbe, Moore and Rainear.

Cranford responded: "Clearly we need to take action while the current management team is in place. One question -- if we place Nancy on a PIP and the merger occurs will we limit our options any?" (Doc. 32-2, PAGEID# 2377). After Plaintiff extended her FMLA leave from August 20, 2012 to September 18, 2012, the new return date was sent by Cranford via email to Moore, Toebbe, Felmeier, Shefte and Rainear on August 30, 2012. (Doc. 33-3, PAGEID# 2656). Rainear responded and asked Shefte: "what happens if Nancy is still out of leave when we begin interviewing for Tier 6 positions? We will need to move forward with a selection for that role." (Id.)

The Court concludes that there are genuine issues of material fact as to whether Defendant's articulated reasons for failing to re-hire her into the Billing Supervisor position is in reality a pretext to mask discrimination. Therefore, Defendant is not entitled to summary judgment on Plaintiff's claim of retaliation under the FMLA.

### D. ADA

Plaintiff claims discrimination, retaliation and failure to accommodate in violation of the Americans with Disability Act, 42 U.S.C. § 12101, *et seq*. Plaintiff also claims disability discrimination in violation of Ohio Revised Code § 4112.02, *et seq*. and §4112.99.

The Americans with Disabilities Act, as amended by the Amendments Act of 2008

("ADAAA"), makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). The ADA also prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter...." 42 U.S.C. § 12203(a).

Plaintiff has also brought claims for discrimination under Ohio law. Because Ohio's disability discrimination law parallels the ADA, the same analytical framework applies to Plaintiff's claims under Ohio Revised Code § 4112.02 and § 4112.99. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (citing *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 450 (6th Cir. 2007); *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206-07 (1998)). Therefore, the analysis of Plaintiff's ADA claims also resolves her state law discrimination claims. *Id.* (citing *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452 n.4 (6th Cir. 2004)).

**1.  Discrimination under ADA and Ohio law**

Under the ADA, a plaintiff can prove a claim for discrimination based on direct or indirect evidence. *Ferrari v. Ford Motor Company*, 826 F.3d 885, 891 (6th Cir. 2016). Here, Plaintiff has not produced any direct evidence of discrimination, and instead relies on indirect evidence. When analyzing a discrimination claim based on indirect evidence

of discrimination, courts use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1179-182 (6th Cir. 1996)).

Under this approach, the initial burden is on the plaintiff to make out a prima facie case of discrimination by demonstrating that "(1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *4 (6th Cir. Jan. 9, 2018) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)). Furthermore, the plaintiff's disability must be a "but for" cause of the adverse employment action. *Tennial v. United Parcel Serv.*, 840 F.3d 292, 306-307 (6th Cir. 2016); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc).

If the plaintiff establishes a *prima facie* case of discrimination under the ADA, then the burden shifts the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). If the defendant makes that proffer, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason is merely a pretext for discrimination. *Id.*

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. §

12102(2)(B). A person may also be considered disabled under the ADA if they are "regarded as having such an impairment." 42 U.S.C. § 12102(2)(C). The ADA provides that the definition of disability "shall be construed in favor of broad coverage of individuals...." 42 U.S.C. § 12102(4)(A).[6] Plaintiff claims she is disabled because her hearing is limited and she has severe mold allergies. Defendant does not dispute that Plaintiff was disabled under the ADA or that it knew Plaintiff was disabled.

Plaintiff's ADA discrimination claim is based on Defendant's failure to re-hire her into her own position of Billing Supervisor or any of the internal positions she applied for after she learned she had not been hired into the Billing Supervisor position.[7]

---

[6]As the Sixth Circuit has explained, the law governing the definition of "disabled" under the ADA has been recently altered:

> Having concluded that the courts were defining "disability" too narrowly, Congress amended the ADA in 2008 to state that the term should be construed "in favor of broad coverage ..., to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A); ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008). Moreover, Congress explicitly rejected a number of standards formulated by the Supreme Court, such as the requirement that the impairment be "permanent or long-term" to qualify as a disability under the ADA. 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); ADAAA § 2(b)(4) (stating that a purpose of ADAAA is to "reject ... standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)," which included the requirement that an impairment's impact be "permanent or long-term" to qualify as a "substantial limitation"). Congress also cautioned that "the question of whether an individual's impairment is a disability ... should not demand extensive analysis." ADAAA § 2(b)(5).

*Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *4 (6th Cir. Jan. 9, 2018).

[7]In her opposition to Defendant's Motion for Summary Judgment, Plaintiff stated several times that Defendant's Rule 30(b)(6) witness testified that was that it is company policy that an employee is disqualified from applying for positions internally if he or she is on a PIP. However, the testimony was as follows:

> I'm telling you first that when an employee applies, the first thing an employee has to acknowledge is that they are eligible to apply. . . . If you are an internal employee, if you are under a PIP, or if you are under certain performance ratings,

---

26

Plaintiff has not established that Defendant would have hired her into these positions "but for" her difficulty hearing or severe mold allergies.[8]  It is well-settled that "conclusory allegations and subjective beliefs ... are wholly insufficient evidence to establish a claim of discrimination as a matter of law."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992); *Helfich v. Nw. Ohio Orthopedics & Sports Med., Inc.*, 570 Fed.Appx. 585, 588 (6th Cir. 2014) ("Mere speculation will not do.").  While Defendant did reference communication issues in Plaintiff's mid-year performance approval and PIP, those issues were broader than any difficulties Plaintiff may have due to her hearing.  The following expectations were listed under "Communication Skills" in the PIP:

- Be receptive to feedback and take appropriate action(s).
- Verbal and written communications are necessary to ensure work coverage, work activities and issues are reported to team and/or management in a timely fashion.
- All disagreements with supervision/employees should be discussed in private and without insubordination and without inappropriate non-verbal.
- Communication skills should be developed to present positive image to team, teammates, peers, and management.
- Needs improvement speaking concisely
- Grammatical errors distract from the topic at hand
- Needs to effectively use non verbal communications

(Doc. 57-4 at PAGEID# 8014).  Moreover, these issues were not something that surfaced in 2012.  In Plaintiff's annual performance review for 2011, Moore commented that "Nancy recognizes her challenges in written communication and is working hard to improve via classes through work.  I would like Nancy to continue to work on her written

_____

you are not allowed nor eligible to apply, first of all, for a job that makes you ineligible.

(Doc. 25, Broome Dep. at 30-31; PAGEID# 1184-1185).  Therefore, it is not clear from the record that a PIP is an automatic disqualification from internal positions.

[8]Plaintiff explained that the sinus issues impacted her hearing.  (Doc. 37, Brown Dep. at 20, PAGEID# 3307).

communications." (Doc. 37-1, PAGEID# 3708).

Therefore, Defendant is entitled to summary judgment on Plaintiff's claim that Defendant discriminated against her under the ADA and Ohio law when it failed to either re-hire or hire her.

### 2. Retaliation under the ADA

ADA retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting approach. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)). The plaintiff bears the initial burden to establish a prima facie case of retaliation, which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Rorrer*, 743 F.3d at 1046. The plaintiff must show "but for" causation. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

The Sixth Circuit has explained that the ADA is not "a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA." *Rorrer*, 743 F.3d at 1046 (citing 42 U.S.C. § 12203(a)). "Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Id.* (quoting *Goonan v. Fed. Reserve Bank of New York*, 916 F.Supp.2d 470, 484–85 (S.D.N.Y. 2013)). Here, Plaintiff has not identified specific activity she claims was covered by the ADA. However, the Sixth Circuit has held that a request for accommodation is a protected act under the ADA. *See A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698

(6th Cir. 2013).

Plaintiff claims that she asked for the following accommodations: an air filter for her office, the use of another employee as a proofreader, and additional time off work to get allergy shots.

According to Plaintiff, she began having sinus infections due to mold in her office building in January of 2012, and asked for the air filter for her office on May 23, 2012. (Doc. 38-1, PAGEID# 3969). It not clear when Moore told Basch that she needed to prioritize her own deadlines over the proofreading work she was doing for Plaintiff, or when Plaintiff requested the use of another employee as a proofreader.

"'Closeness in time is one indicator of a causal connection,'" but "'where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.'" *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 513 (6th Cir. 2016) (quoting *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) ("Temporal proximity alone in the absence of other direct or compelling circumstantial evidence is generally not sufficient to support a finding of causal connection."). Because at least five months elapsed between the request for an air filer and the request for a proofreader, Plaintiff cannot rely upon temporal proximity alone. However, Plaintiff has not presented other evidence of retaliatory conduct which would establish causation. The Court notes that on September 28, 2012, Plaintiff reported to Cranford that she felt "harassed again," but there is no evidence that Plaintiff's generalized complaint made any impact on the decision to not hire Plaintiff. "Subjective

beliefs, without affirmative evidence, are insufficient to establish a claim of retaliation." *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 491 (6th Cir. 2006).

As to the request for time off for allergy shots, the Court notes that Plaintiff's doctor completed the FMLA Health Care Provider Certification form for Plaintiff to request time off for allergy shots on October 30, 2012. (Doc. 37-1, PAGEID# 3748). It appears from the record that Plaintiff submitted this form along with other documentation to Defendant on November 8, 2012. (Doc. 37-1, PAGEID# 3752). However, Plaintiff was not selected for her position as Billing Supervisor at the end of October. Based on this chronology, Defendant's failure to re-hire Plaintiff could not be in retaliation for Plaintiff's request for time off for to get allergy shots. The request for time off can only be considered as a basis for the failure to hire Plaintiff in other internal positions. However, Plaintiff has not presented evidence which would show that the managers hiring for these positions knew that she had requested time off work for allergy shots to accommodate her disability of severe allergies. Therefore, Plaintiff cannot establish a prima facie case of retaliation. Moreover, Plaintiff has not presented any evidence from which a reasonable jury could find that poor performance was not the real reason that Defendant failed to hire Plaintiff, and that unlawful retaliation in fact was. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015).

Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA retaliation claim.

### 3. Failure to accommodate under the ADA

To establish a prima facie case of failure to accommodate, plaintiff must show that: (1) he or she is disabled within the meaning of the ADA; (2) he or she is otherwise qualified

for the position, with or without reasonable accommodation; (3) his or her employer knew or had reason to know about his disability; (4) he or she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Keogh v. Concentra Health Servs., Inc.*, 752 F. App'x 316, 326 (6th Cir. 2018) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). As part of this prima facie case, the plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007).

Unlike a disability discrimination claim premised on wrongful termination "because of disability," the burden-shifting framework set forth in *McDonnell Douglas* does not apply to a failure to accommodate theory. *Brumley v. United Parcel Serv.*, Inc., 909 F.3d 834, 839 (6th Cir. 2018). Instead, ADA discrimination "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Id.* (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007)).

As the Sixth Circuit has recently reiterated, "[t]he ADA does not obligate employers to make on-the-spot accommodations of the employee's choosing." *Id.* Instead, "an employer must engage in an 'informal, interactive process' with the employee to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Id.* (quoting *Kleiber*, 485 F.3d at 871). However, the failure to engage in the interactive process is not an independent violation of the ADA." *Keith v. Cty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013). Instead, as the Sixth Circuit has explained:

> the failure to engage in the ADA's interactive process "is actionable only if it prevents identification of an appropriate accommodation for a *qualified individual.*" *E.E.O.C. v. Ford*, 782 F.3d at 766. As we have previously explained, when "the employee fails to create a genuine dispute of material fact that a reasonable accommodation would have allowed her to perform the essential functions of her job, she cannot survive summary judgment on an interactive-process claim." *Williams*, 847 F.3d at 395.

*Cooley v. E. Tennessee Human Res. Agency, Inc.*, 720 F. App'x 734, 739 (6th Cir. 2017). Therefore, for Plaintiff to succeed on her ADA accommodation claim, she must first show that the use of an air filter for her office, the use of another employee as a proofreader, and additional time off work to get allergy shots would have been reasonable accommodations which would allow her to perform the essential functions of her job.

Plaintiff's physician's note does not state that using an air filter at work would allow Plaintiff to perform the essential functions of her job. (Doc. 57-3, PAGEID# 7977). Plaintiff's physician note regarding the time off for allergy shots states that she can work, but needs to be seen in the office once a week between the hours of 12:30 to 4:30 pm to receive the shots. (Doc. 37-1, PAGEID# 3748). As far as the use of a proofreader, Plaintiff does not point to evidence where she requested this accommodation. If the employee never requests an accommodation, the employer's duty to engage in the interactive process is never triggered. *Lockard v. Gen. Motors Corp.*, 52 Fed.Appx. 782, 788 (6th Cir. 2002). Therefore, Plaintiff has failed to create a genuine dispute of material fact that a reasonable accommodation would have allowed her to perform the essential functions of her job. Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claim.

### E. <u>Title VII</u>

Plaintiff claims that Defendant retaliated against her for making protected

complaints of discrimination to the legal department and HR about herself and others. Defendant responds that Plaintiff raises this claim for the first time in response to Defendant's Motion for Summary Judgment. The Court notes that Plaintiff does not specifically raise a retaliation claim under Title VII in her Complaint (See Doc. 1, PAGEID# 7-8), but the Court will nevertheless address the arguments Plaintiff makes in support of such a claim.

To establish a prima facie case of retaliation under Title VII, a plaintiff must establish that: "(1) he [or she] engaged in a protected activity under Title VII; (2) his [or her] "exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.'" *Rogers v. Henry Ford Health Sys.*, 2018 WL 3629057, at *8 (6th Cir. July 31, 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

The Sixth Circuit has "repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected activity for purposes of establishing a prima facie case of retaliation." *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 Fed. Appx. 651, 655 (6th Cir. 2012). However, "Title VII does not protect an employee, however, if his [or her] opposition is merely a 'vague charge of discrimination.'" *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

The only concrete complaint regarding discrimination which Plaintiff has identified was during the summer of 2011. Plaintiff contacted the HR department because she

believed Adams was interfering with Plaintiff's efforts to discipline Williams, McGee and Elliot based on the race and gender of these employees. Plaintiff was placed on a PIP at the end of September of 2012. Plaintiff was not re-hired for her position as Billing Supervisor until the end of October of 2012. The lengthy gap between the protected activity and any adverse actions is insufficient to establish a causal nexus. *See Timm v. Wright State Univ.*, 375 F.3d 418, 423 (6th Cir. 2004); *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir.1999).

Therefore, Defendant is entitled to summary judgment on any claim of retaliation under Title VII brought by Plaintiff.

### III.  CONCLUSION

Based on the foregoing, Defendant Duke Energy's Motion for Summary Judgment (Doc. 40) is **GRANTED in PART** and **DENIED in PART**. Plaintiff's claim of retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* remains pending; but Defendant is entitled to summary judgment on all other claims.

**IT IS SO ORDERED.**

            */s/ Michael R. Barrett*
JUDGE MICHAEL R. BARRETT